IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

HENRY C. PAYTON                                                    PETITIONER

VS.                                            CIVIL ACTION NO  3:08cv108-DPJ-FKB

SAM WINCHESTER                                                     RESPONDENT

### REPORT AND RECOMMENDATION

This cause is before the Court on the petition for writ of habeas corpus filed by

Henry C. Payton, a state prisoner.  Having considered the petition, response, reply and

state court record, the undersigned recommends that habeas relief be denied and the

petition be dismissed with prejudice.

### I. FACTS AND PROCEDURAL HISTORY

On September 29, 1995, around midday, a commercial building was set on fire in

the town of Walnut Grove, Mississippi.  While authorities were responding to the fire,

which had been set as a diversion, three men - Cleon Graves, Cornelius Belmer, and

Dedrick Marshall - entered the Bank of Walnut Grove and robbed it at gunpoint,

terrorizing and threatening to kill bank employees.  When the men realized that their

accomplice who was to drive the getaway car had abandoned them, they took the

president of the bank, Ray Britt, as a hostage.  Forced by his captors to drive his own car,

Britt led law enforcement authorities on a high speed chase through a road block in

Forest and then west on Interstate-20  toward Jackson.  Unable to stop the vehicle, which

was at times traveling in excess of one hundred miles an hour, law enforcement officers

radioed two truck drivers traveling ahead of Britt's car.  The truck drivers slowed down and drove their semi-trucks side-by-side on the interstate to prevent the men from passing them.  Britt's captors then ordered him to take the Morton exit.  After doing so, Britt grabbed the gun that had been pointed at him throughout the chase and crashed his car into a concrete barrier.  Law enforcement officers then closed in, freed Britt, and arrested Marshall, Graves, and Belmer.

All three men implicated Henry Payton as the mastermind behind the arson, robbery, and kidnapping.  According to the accomplices, Payton planned the crimes and recruited their assistance, brought them to Walnut Grove from Jackson in order to commit the robbery, supplied them with guns and masks, and drove them to the bank.  Payton was to wait for them in the getaway car outside the side entrance to the bank.  After learning of Payton's involvement, authorities arrested Payton and charged him with armed robbery, kidnapping, and arson in the second degree.  He was tried with one of his co-defendants, Marshall, and convicted on all three charges.  The trial judge, the Honorable Marcus Gordon, sentenced him to consecutive life sentences on the armed robbery and kidnapping charges and five years on the arson charge.  The Mississippi Court of Appeals affirmed. The Mississippi Supreme Court granted certiorari and reversed for the trial court's failure to sever Payton's trial from that of Marshall's and for the prosecutor's "send a message" argument during closing.  At his second trial, Payton was again convicted on the armed robbery and arson charges but was acquitted on the kidnaping charge.  Judge Gordon sentenced him to thirty-eight years for armed robbery and ten years on the arson conviction.  Payton appealed, raising the following issues:

1.   Whether Payton received a fair and impartial trial after he was brought before the jury wearing shackles and chains.

2.   Whether the trial judge committed reversible error in overruling Payton's motion for mistrial after the evidence showed the court had an interest in the case.

3.   Whether the trial court committed reversible error when it denied Payton's motion for a directed verdict or in the alternative a mistrial.

4.   Whether the trial court harbored animosity toward Payton's counsel and was no longer impartial, committing reversible error in overruling Payton's motion for recusal.

5.   Whether the trial court erred in permitting the introduction of Payton's statement when he had been denied his Miranda warnings?

6.   Whether the trial court erred in sentencing Payton to a term of years that is not reasonable expected to be less than his life expectancy.

7.   Whether the trial court improperly enhanced Payton's sentence because he continued to assert his innocence and because the court was vindictive.

8.   Whether the trial court committed reversible error in overruling Payton's motion of recusal on post-conviction motions.

9.   Whether the court erred in not hearing testimony from jurors who provided affidavits about matters outside jury deliberation that affected their verdict.

The Mississippi Supreme Court confirmed the convictions but reversed the armed robbery conviction, finding that his thirty-eight year sentence was not reasonably expected to be less than his life expectancy.

During the hearing on post-trial motions an exchange had occurred between Judge Gordon and Payton's attorney which resulted in Judge Gordon's citing the attorney for contempt and incarcerating him for three days.  Following this incident, both Judge Gordon and the other circuit judge in the district had entered an order of recusal, requesting that the Mississippi Supreme Court appoint a special judge to hear all

3

subsequent motions in the case.  Shortly thereafter, the supreme court appointed the Honorable Elzy Smith to conduct proceedings in the Payton's case.  Notwithstanding this appointment, when Judge Gordon received notice of the supreme court's reversal of the armed robbery sentence he had imposed, Judge Gordon issued an order setting resentencing before himself.  Payton responded by filing a motion requesting that Judge Gordon recuse himself.  Judge Gordon denied the motion, presided over the resentencing, and sentenced Payton to twenty-five years on the armed robbery conviction.  Payton appealed the new sentence, arguing that Judge Gordon, having previously recused himself, was without authority to sentence him.  The Mississippi Court of Appeals agreed and reversed and remanded for resentencing by a special judge to be appointed by the Mississippi Supreme Court.  The Honorable Sharion Aycock was appointed for this purpose.  Judge Aycock sentenced Payton to a term of twenty-five years on his armed robbery conviction.

After the reversal and remand by the state court of appeals and prior to his resentencing by Judge Aycock, Payton filed a state application for post-conviction relief (PCR).  The application was denied.  After the resentencing, he again filed for post-conviction relief; this application was likewise denied.[1]

---

[1]The two PCR applications raised essentially identical issues.  Those issues were the same as those set forth in the present habeas petition. The order denying the first PCR application, dated March 1, 2005, stated as follows:

After consideration, the panel finds that Payton's claim of ineffective assistance of counsel fails to meet the standard imposed by *Strickland v. Washington*, 466 U.S. 668 (1984) and that the claim of recanted testimony is unsupported by affidavit.  The remaining issues were capable of determination at trial and on appeal such that they are now procedurally barred from further review.  Miss. Code Ann. § 99-39-21(1).

Payton then filed the present habeas petition, raising the following grounds for relief:

1.  His rights to due process were violated by (a) the lengthy time period during which the appeal of his first trial was pending in state court; and (b) the fact that he was brought into the courtroom prior to jury selection in waist and leg chains.

2.  His attorney rendered ineffective assistance by

    (a)  failing to appear at a pretrial motion hearing;

    (b)  failing to conduct *voir dire* of prospective jurors regarding Payton's appearance in the courtroom in restraints;

    (c)  failing to subpoena witnesses; and

    (d)  engaging in other actions that violated the Mississippi Rules of Professional Conduct and resulted in sanctions.

3.  The trial court erred in rejecting Payton's post-trial argument that the jurors did not understand the voting process or the judge's instructions.

4.  His trial was rendered unfair by prosecutorial misconduct.

5.  His trial was rendered unfair because of judicial misconduct.

6.  He is entitled to habeas relief based upon newly-discovered evidence.


## II.  ANALYSIS

In ruling on Payton's first PCR application, the Mississippi Supreme Court rejected as procedurally barred Payton's claim based upon the delay in his first appeal. Where a

---

The order denying the second PCR application merely stated that the court found that "the petition should be denied." The denial was undoubtedly based either upon that fact that the petition was successive or that the reasons given in the previous order were equally applicable to the second petition.

state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is generally barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  There is no basis in the record for application of either of these exceptions.  Accordingly, review of the merits of this claim is beyond the power of this court.

Payton's remaining claims were adjudicated on the merits by the state court, either in his direct appeal or in his PCR proceeding,[2] and are therefore subject to the highly deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of these claims involved "an unreasonable application of . . . clearly established Federal law . . .  as determined by the Supreme Court of the United States." *Id.*  The Supreme Court has repeatedly emphasized that " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Renico v. Lett*, 130

---

[2]On its face, the supreme court order denying Payton's initial PCR application appears to deny all claims as procedurally barred pursuant to Miss. Code Ann. § 99-39-21(1), other than those alleging ineffective assistance of counsel and prosecutorial misconduct. However, Payton's claims based upon his appearance before the jury pool in shackles, his juror misconduct claim, and his judicial misconduct claim were clearly not procedurally barred under this section, as these claims had been presented and addressed in Payton's direct appeal.  Rather, these claims were undoubtedly not considered at the PCR stage because they had already been considered on appeal and were therefore barred pursuant to Miss. Code Ann. § 99-39-21(3), the *res judicata* bar.

S.Ct. 1855, 1862 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  "[A]

federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly."  *Williams*, 529 at 411.  Rather, the application

must be not only incorrect, but also "objectively unreasonable."  *Renico,* 130 S.Ct. at 1862

(quoting *Williams*, 529 U.S. at 409).  Moreover, state findings of fact are entitled to a

presumption of correctness which can be rebutted only by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

### *Denial of Due Process*

Payton contends that his right to due process was violated by his appearance

before the jury pool in waist and leg chains for at least five minutes.  The due process

clause prohibits the *routine* use of visible restraints during a criminal trial.  *Deck v.

Missouri*, 544 U.S. 622, 626 (2005).  In the present case, Payton initially appeared before

the prospective jurors wearing leg restraints and a chain at his waist; his hands were free.

After a few minutes in the courtroom, represented by approximately twenty lines in the

transcript, the court recessed.  During the recess, defense counsel raised the issue of the

restraints and moved to strike the panel.  The trial judge considered the matter and

observed that he had not noticed the restraints and that the first row of jurors had been

seated approximately twenty-five feet from Payton with their view obstructed by the

lectern and by the attorneys seated at the counsel table.  The court overruled the motion

at the time but allowed defense counsel additional time during *voir dire* to explore the

question of whether any of the jurors had noticed the restraints.  The restraints were removed, the prospective jurors returned to the courtroom, and jury selection continued. However, Payton's attorney failed to raise the issue of restraints during his *voir dire* of the jury panel.

The state supreme court acknowledged that permitting the jury to see a defendant in shackles encroaches on the presumption of innocence; however, the court concluded that in this particular case, there were no grounds for reversal.   The court explained that "Payton's hands were not restrained.  He had a chain around his waist and cuffs on his ankles.  He was seated at his attorney's table and it is probable that the restraints were thus hidden from the view of the potential jurors."  Furthermore, Payton was in restraints for only a few minutes, and the restraints were removed, outside the presence of the jury, as soon as they were brought to the trial judge's attention.  The court concluded that this technical violation, through an oversight, did not warrant reversal.

*Deck* represents the Supreme Court's most recent and most comprehensive jurisprudence on the issue of restraints.  However, because the decision of the Mississippi court predates *Deck, Deck* cannot directly define the "clearly established law" to be considered in this court's analysis.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (AEDPA analysis is limited to the clearly established law existing at time of the state court's decision).  *Deck* does, however, set forth a history of jurisprudence in this area that is instructive.  The *Deck* opinion cites to Supreme Court cases, as well as cases from lower courts, supporting the view that the shackling of a criminal defendant throughout a trial undermines the presumption of innocence and should be avoided whenever possible.

8

*See, e.g., Estelle v. Williams*, 425 U.S. 501 (1976) (state cannot compel accused to stand trial wearing identifiable prison garb); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (acknowledging that the sight of shackles and gags on defendant could have significant effect on jurors' attitude toward him).  There is no case, however, in which the Supreme Court has held that a criminal defendant's brief, advertent appearance in restraints before prospective jurors violates the due process clause.  Furthermore, in the present case, the state court's findings of fact concerning the likelihood that the prospective jurors had not noticed the restraints are entitled to a presumption of correctness.  The undersigned concludes that the state court's adjudication of this claim was not an unreasonable application of clearly established Supreme Court law.

**Juror Confusion**

In Claim Three of his petition, Payton alleges that the jury verdicts were the product of misunderstanding and confusion on the part of the jurors.  During the deliberation process, the jurors sent a note to the trial judge posing the following questions:

> Judge, we the jury have misunderstood the voting process.  We need to know if we need an unanimous vote on <u>all</u> three counts?  Do all three counts have to be <u>exactly</u> the same?  Example: All guilty <u>or</u> all not guilty

The judge responded as follows:

> You are required, before the Court can accept a verdict, it must be agreed to by all twelve jurors, whether that verdict is guilty or not guilty.  There are three charges in the indictment, and you must make separate unanimous verdicts regarding all three counts.

You are required to find Defendant guilty or not guilty in all three counts,[3]  but you must make a separate finding on each count.  Refer to Instruction S-2.[4]  Continue with your deliberations.

Payton argues that the supplemental instruction did not respond appropriately to the question and confused the jury by failing to instruct them to inform the court if they were deadlocked and by leading them to believe that they had to reach a unanimous verdict on each count.  In support of this argument, Payton has submitted the affidavits of two jurors, Johnnie R. Langdon and Stanley Rushing.  Langdon, in her affidavit, states that after the jurors had deliberated for some time, it became apparent that they could not agree on a verdict because at least three jurors, including herself, voted for a not-guilty verdict on all counts.  She concluded from the judge's written supplemental instruction that the jurors would not be allowed to leave unless they reached a unanimous verdict on each count.  She states that she was alarmed by this response from the judge because she had child care problems she needed to address and could not stay at the courthouse.  Ms. Langdon states that she did not believe that the state had proven Payton guilty beyond a reasonable doubt on all three counts but that she voted for guilt on each count so that she would be allowed to go home.  The affidavit of Stanley Rushing indicates his understanding of the supplemental instruction was that a hung jury was not an option.  He states that he did not believe that the prosecution proved Payton's guilt beyond a

---

[3]The trial judge orally dictated the instruction, which was then transcribed and the transcription sent to the jury.  In his oral dictation, the judge stated, "You are *not* required to find the Defendant guilty or not guilty in all three counts . . . ."  (emphasis added).

[4]Instruction S-2 stated that the jury "should deliberate on each count separately and return separate verdicts for each count."

reasonable doubt but that he changed his vote in order for the jury to reach a unanimous verdict.

The state court, in considering this claim, concluded that the affidavits submitted by Payton were inadmissible in that they concerned only internal jury deliberations, not extraneous influences on the jurors.  The United States Supreme Court has held that the Constitution does not require consideration of evidence by jurors impeaching their verdict where no extraneous influences on the jury are involved.  *Tanner v. United States*, 483 U.S. 107, 126-27 (1987) (Constitution did not require lower court to consider evidence that jurors were intoxicated during trial); *see also Reyes v. Seifert*, 125 Fed. Appx. 788 (9th Cir. 2005) (state court did not unreasonably apply Supreme Court law when it determined that defendant had no constitutional right to a new trial after juror testified his decision to vote guilty was based upon coin toss); *Salazar v. Dretke,* 419 F.3d 384, 400 (5th Cir. 2005) (state court's refusal to consider evidence of improper juror statements regarding parole made during deliberations was not contrary to, or an unreasonable application of, clearly established Supreme Court law).  The *Tanner* court reasoned that the exclusion of juror evidence was permissible in light of the "long-recognized and very substantial concerns support[ing] the protection of jury deliberations from intrusive inquiry."  483 U.S. at 127.  Thus, the state court's refusal to consider the affidavits was not an unreasonable application of clearly established Supreme Court case law.[5]

---

[5]Fed. R. Evid. 606(b) provides that evidence impeaching a jury's verdict is inadmissible.  Thus, were this court to hold an evidentiary hearing or otherwise receive evidence in support of Payton's claim, the juror affidavits could not be considered.

Having rejected any inquiry into the actual jury deliberations, the state court focused its analysis on the question of whether the trial was rendered unfair by the trial court's supplemental instruction.  It answered this question in the negative.  The undersigned likewise concludes that the supplemental instruction did not violate Payton's rights.  Jury instructions in state criminal trials generally do not provide a basis for habeas relief.  *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir.2002) (citing *Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991)).   Where a state prisoner challenges a jury instruction, habeas review is limited to a determination of whether the instruction "so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Moreover, the instruction is to be considered in the context of the instructions as a whole and the entire trial record.  *Id.*  In the present case, the state court acknowledged on appeal that the trial court's instruction in response to the note from the jury was problematic.  However, after considering the instruction along with the other instructions to the jury, the state court concluded that the jury was fairly apprised of the applicable law concerning their obligation to vote their conscience.  The supreme court specifically noted that three other instructions informed the jurors that they were not to surrender their honest convictions and beliefs merely to save time or to prevent a mistrial.[6]  The supreme court also

---

[6]In D-1, the trial court instructed the jurors not to surrender their honest convictions as to the weight or effect of the evidence solely because of the opinion of fellow jurors "or for the mere purpose of returning a verdict."  This instruction also stated as follows: "If there is any juror who is not convinced beyond a reasonable doubt of the defendant's guilt, it is his or her duty to vote 'Not Guilty,' even though it may cause a mistrial of this case."  D-4 stated in relevant part as follows:

considered defense counsel's *voir dire*, during which he asked prospective jurors whether they understood that they did not need to change their minds or vote the way someone else wanted them to just for the purpose of reaching a verdict.  Payton's counsel also asked the prospective jurors if they understood that if they could not reach a verdict they could inform the judge of their inability by sending a note.  Finally, the state supreme court observed that the jury was polled after the verdict, and each juror agreed that the verdict was his.

The undersigned concludes that the state supreme court's determination that the jury instructions, taken as a whole, and in the context of the entire trial, adequately informed the jury of their duty to vote their conscience even in the face of a mistrial, was not objectively unreasonable.  No habeas relief is warranted on Claim Three.

### Prosecutorial Misconduct

In Claim Four, Payton argues that his conviction was the product of prosecutorial misconduct.  Specifically, he alleges that the prosecution encouraged two witnesses, Cleon Graves and Eric Freeman, to testify falsely.  As evidence in support of this claim,

---

You cannot, under your oath as a juror, compromise your honest convictions from the evidence, or lack of evidence, as to the guilt or innocence of the Defendant for the purpose of bringing in a verdict.  Under your oath and under the law, you should never surrender such conviction simply because every other member of the jury may disagree with you or insist that you yield to save the time of the court or prevent a mistrial, or shorten the labors of the jury panel or because of anything or reason whatsoever, or for any purpose whatsoever.

Likewise, in D-10, the court stated that any juror having reasonable doubt as to guilt was to stand by his conviction, even if every other juror disagreed with him.

he points to a written statement signed by Graves and a tape-recorded statement by Freeman.

Graves was one of the principal prosecution witnesses at trial.   On the day after the robbery he gave a statement to authorities, and his trial testimony was consistent with the substance of the written statement.  Graves, who was twenty years of age at the time, worked for Payton in his automobile shop.   Approximately three months prior to the crime, Payton approached Graves, Marshall, and Belmer with a plan to rob a bank.  A few days prior to the planned date of the robbery, Payton and his accomplices drove to Walnut Grove to check out the route and the bank.  On the night prior to the robbery, Payton and his girlfriend purchased stockings for disguises and accelerant for the fire. Payton also supplied all three of his accomplices with guns.  On the morning of September 29, Payton, Graves, Marshall, and Belmer drove in two vehicles - Payton's BMW and his truck - from Jackson to Walnut Grove.  They stopped at a building which Payton set on fire as a distraction and then proceeded to the bank in the BMW driven by Payton, the truck having been hidden earlier.  The plan was for Payton to wait in the BMW while the other three robbed the bank; they were then to exit the side door and flee the scene into the awaiting BMW.   Payton also suggested that if anything went wrong during the course of the robbery, they should take a hostage.  Graves, Marshall, and Belmer robbed the bank as planned, but when they were ready to leave, Payton was nowhere to be seen.   The accomplices panicked and took a hostage, making their getaway in the hostage's automobile.

After Payton's first trial, Graves pleaded guilty and was sentenced to a term of

thirty years.  Prior to Payton's second trial, both Payton and Graves were incarcerated at Wilkinson County Correctional Facility (WCCF).  During this period, Graves signed a second statement.   This statement was signed by Payton as a witness and was notarized by a WCCF employee by the name of Jeanette Tolliver Delanney.  The essence of this second statement was that law enforcement authorities had orchestrated the charges against Payton and had coerced and threatened Graves into implicating Payton as the mastermind of the robbery and as the driver of the getaway car.  In the statement, Graves claimed that he was told that if he would testify against Payton, he would receive a sentence of thirty years with parole for his part in the crime.  This second statement identified five persons as having participated in a plan to intimidate Graves into implicating Payton:  Sheriff Jimmy Callahan; Officer Ricky Lewis; Ken Turner, the prosecutor who tried the case against Payton; and the trial judge, Marcus Gordon. Graves alleged in the statement that Judge Gordon had told him that if Graves' testimony at Payton's trial did not result in Payton's conviction, he would revoke Graves' sentence and order him to stand trial for the maximum penalty.

At trial Graves completely denied the truth of this second statement and testified that it had been the product of threats by Payton.  He stated that Payton had composed the statement and had given it to Graves to be copied in Graves' handwriting.  Graves agreed to copy the statement after Payton told him that he knew how to make Graves help him and threatened to harm Graves' family.   When called as a witness at the post-trial hearing on Payton's motion for bond on appeal, Graves again testified that his second statement had been composed by Payton and that he had signed it under duress.

Nevertheless, Payton points to Graves's second statement as evidence of prosecutorial misconduct.

Payton makes a similar argument concerning the testimony of Eric Freeman. Freeman was incarcerated with Payton at the Leak County Correctional Facility on unrelated charges several weeks prior to Payton's second trial.  At trial he testified for the prosecution, stating that Payton had boasted to him about having masterminded the bank robbery and had described his attempts to fabricate an alibi.  Freeman also testified that Payton asked him to try to persuade Marshall, Graves, and Belmer to change their statements to exonerate Payton.  After the trial, Freeman engaged in a tape-recorded conversation with Payton's defense counsel and the counsel's investigator in which he partially recanted his testimony.  A transcription of the conversation, which is unsworn, was presented to the state court in Payton's application for post-conviction relief and is attached to his habeas petition.  During this conversation, Freeman told Payton's attorney that Payton asked him to persuade the three accomplices to testify that he was not present at the robbery.  Freeman goes on to state that he later received a visit from the assistant prosecutor, who asked him some questions and then went through a "list" of questions with him.  He indicates in the recorded conversation that some of his trial testimony was true but that parts of it were supplied from the assistant prosecutor's "list." He admits during this conversation that he decided to give the recorded statement to Payton's attorney because Payton asked Freeman to change his story.

Subsequent to the alleged date of this conversation, Freeman testified at the hearing on Payton's motion for bond on appeal.  This time he merely stated that

"someone" had asked him to change his testimony, and that as a result, he contacted Payton's attorney and then met with him and the investigator.  Significantly, Freeman testified that the "list" to which he had referred contained things that he told the prosecutor, not things the prosecutor had asked him to say.

Payton's claim of prosecutorial misconduct has very little evidentiary basis.  In his sworn testimony at trial and at the post-trial hearing, Graves completely refuted his second statement.  As to Freeman's alleged implication of the prosecution in improper conduct, the state court rejected this claim based upon the lack of any affidavit or sworn testimony to support it.   The state court's conclusion that Payton had failed to meet his burden of establishing improper conduct by the prosecution and its rejection of this claim was not based upon an unreasonable application of clearly established Supreme Court law or an unreasonable determination of the facts.  No relief is available on this claim.

### Ineffective Assistance of Counsel

Payton alleges four claims of ineffective assistance of his trial counsel, Chokwe Lumumba.  Ineffective assistance claims are analyzed under the familiar two-prong analysis of *Strickland v. Washington*, 466 U.S. 668 (1984).  First, a petitioner must show that his attorney's performance was deficient.  466 U.S at 688.  "Deficient" means that counsel's performance was "outside the wide range of professionally competent assistance."  *Id.* at 690.  If a petitioner succeeds in establishing deficiency on his counsel's part, then he must go on to demonstrate that his attorney's deficient performance prejudiced the defense such that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The standard of review of an attorney's performance is "highly deferential," and a court considering an ineffectiveness claim is to "indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Id.* at 689.

On June 15, 2001, Payton's attorney failed to appear at a pretrial motion hearing. As a result, Judge Gordon imposed a fine on Mr. Lumumba. Payton contends that as a result of his attorney's failure to appear, two important pretrial defense motions were dismissed.  However, the record does not support Payton's allegation.  At the beginning of the first day of trial, defense counsel brought up his motions for hearing.  The trial judge noted that defense counsel was "a little late," but stated that he would hear the motions anyway.  Thereafter, the court considered numerous pretrial matters raised by Payton's attorney.  The court did deny as untimely the defense's motion to dismiss for failure to provide a speedy trial on remand, but the dismissal was based not on counsel's failure to appear at the motion hearing, but on the timing of the filing of the motion.  The record does not support Payton's allegations of either deficient performance or prejudice related to his attorney's failure to appear at the pretrial motion hearing.  For this reason, the state court's rejection of this claim cannot be said to have been objectively unreasonable.

Payton also challenges his attorney's failure to question prospective jurors regarding Payton's brief appearance in the courtroom wearing restraints.  Although the trial judge granted defense counsel additional time for *voir dire* on this issue, Mr.

18

Lumumba failed to question the jurors regarding the restraints.  Payton has not, however, established that the jury verdict would have been different or that the state appellate court would have ruled differently on appeal if his attorney had taken advantage of the additional time for *voir dire* regarding the restraints.   Therefore, the state court's resolution of this claim was not an unreasonable application of *Strickland.*

The third allegation of ineffective assistance raised by Payton concerns his attorney's failure to subpoena Jeanette Tolliver Delanney to testify for the defense.  Ms. Delanney notarized Cleon Graves' second statement - the statement that Graves refuted at trial.  Payton claims that Delanney would have testified that Graves indicated to her that this statement was written and given of his own free will and without coercion or duress, thereby rebutting Graves' trial testimony.  Payton contends that he gave Mr. Lumumba all the necessary information on her whereabouts, but that Mr. Lumumba informed Payton that Ms. Delanney had moved and that he could not locate her.  Payton disputes his attorney's inability to locate this witness.

Complaints of ineffective assistance of counsel based upon the failure to call a witness seldom provide a basis for federal habeas relief.  *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  In order to prevail on such a claim, a habeas petitioner "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to the defense." *Id.*  Payton cannot establish deficiency on his attorney's part, because he has failed to show that Ms. Delanney could have been located by Mr. Lumumba and would have been available to testify.  Moreover,

in order to show prejudice, Payton must show that but for his attorney's failure to call this witness, the jury would have had a reasonable doubt about his guilt. *Earhart v. Johnson*, 132 F.3d 1062, 1068 (5th Cir. 1998). Given Graves' own testimony that he was under duress when he made the statement, as well as the additional evidence of Payton's guilt,[7] Payton cannot meet this standard. For these reasons, the state appellate court's rejection of this ineffective assistance claim survives the standard of review set forth in § 2254(d).

Lastly, Payton argues that his attorney's allegedly unprofessional conduct before the trial court and the resulting sanctions provide a basis for an ineffective assistance claim. Mr. Lumumba admittedly ran into several difficulties with Judge Gordon during his representation of Payton. In addition to the incident involving defense counsel's failure to appear at the pretrial motion hearing, Payton's attorney was late on the third day of trial. For his tardiness, the judge fined him $25.00. Mr. Lumumba tried to explain that he had understood the starting time to have been set at 8:30 a.m., not 8:00 a.m., but Judge Gordon was not interested in hearing Mr. Lumumba's excuse. After the judge stated for the third time that he had "heard enough," defense counsel moved for Judge Gordon to recuse himself. The court overruled the motion. Matters between the two took a significant turn for the worse, however, during the hearing on Payton's motion for a new trial. At this hearing, defense counsel described Judge Gordon's attitude as "very

---

[7]In addition to Payton's accomplices, at least two other witnesses connected Payton directly to the crime. Jeannie Seamer, a bank customer, identified Payton as the driver of the getaway car. Carey Young, an acquaintance of Payton's, testified that he was present at Payton's shop when Payton and his accomplices planned the robbery. According to Young, Payton asked him to assist, but Young never agreed to do so.

vindictive" and moved for the judge to recuse himself.  Mr. Lumumba also made an unwelcome reference to Judge Gordon's demeanor.  Judge Gordon then ordered him to be removed from the courtroom and fined him $300.  Mr. Lumumba responded to this order by stating that he was proud to be thrown out of Judge Gordon's courtroom and that if he had to pay for justice, that was all right, because he had paid other judges to try to get justice.  For these final remarks, Judge Gordon raised the fine to $500 and ordered Mr. Lumumba to serve three days in jail.  Subsequently, Mr. Lumumba was disciplined by the Mississippi Bar because of his statements to Judge Gordon.

Unprofessional conduct is not the equivalent of ineffective assistance.  As explained *supra*, there is no indication that counsel's failure to appear at the pretrial motion hearing had any adverse effect on Payton's defense.  Counsel's tardiness on the third morning of trial likewise resulted in no identifiable prejudice to Payton.   Furthermore, by the time of the exchange at the post-trial motion hearing, the trial judge had already denied the defense's motion for a new trial.  After the hearing, Judge Gordon and the other circuit judges in the district recused themselves from Payton's case.  Payton has failed to show that his attorney's unfortunate conduct constituted deficient performance or prejudiced him in any way.  The undersigned concludes that the state court's adjudication of this ineffective assistance claim did not result in a decision that involved an unreasonable application of *Strickland.*

### Judicial Misconduct

In Claim Five of his petition for habeas relief, Payton contends that Judge Gordon engaged in judicial misconduct by failing to recuse himself. One basis for this claim arose out of the admission into evidence of Cleon Graves' second statement, in which Graves accused Judge Gordon of assisting the prosecution in trying to construct a case against Payton. Payton also contends that throughout the trial the judge demonstrated animosity toward Mr. Lumumba and vindictiveness toward Payton for having appealed and been granted a new trial. As evidence, he cites to Judge Gordon's impatience with Mr. Lumumba for being late on the third morning of trial and to the exchange between the trial judge and defense counsel, set forth *supra*, which led to Mr. Lumumba being held in contempt, incarcerated, and disciplined by the Mississippi State Bar.

As the Fifth Circuit has stated, "'only in the most extreme of cases' does the Due Process Clause require disqualification of a judge." *Public Citizen, Inc. v. Bomer,* 274 F.3d 212, 217 (5th Cir. 2001)(citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821, 825-26 (1986)). The state court carefully considered the implication of the admission into evidence of Graves's second statement, concluding that "[m]erely presenting a document which testimony revealed was inaccurate and written at the behest of Payton is insufficient to establish that the judge had an interest in the outcome. The court likewise carefully considered all of Payton's allegations concerning Judge Gordon and ultimately concluded that Payton had "failed to present evidence sufficient to overcome the presumption that the judge was impartial while presiding over Payton's case." These findings are entitled to a presumption of correctness under § 2254(e)(1). Moreover, the

22

most heated exchange between Judge Gordon and Mr. Lumumba occurred after Payton's trial; thus, it could have had no bearing on the fairness of the trial.    The undersigned concludes that Payton has failed to meet his burden under § 2254(d) on this claim.

### Newly-Discovered Evidence

In his final ground for relief, described by Payton as a claim based upon "newly discovered evidence," Payton argues that he is entitled to relief based upon the tape-recorded conversation between Payton's attorney and Eric Freeman and upon the juror affidavits regarding deliberations.  Payton does not, however, allege any grounds for relief based upon this evidence distinct from those advanced elsewhere in his petition.  Claim Six of the petition fails to state a cognizable ground for habeas relief.

### III.  CONCLUSION

Petitioner has failed to establish that the state court's adjudication of any of his claims was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.  Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual

findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R.

Civ. P. 72(b); Douglass v. United Services Automobile Association, 79 F.3d 1415,

1428-29 (5th Cir. 1996).

      Respectfully submitted, this the 2nd day of February, 2011.


                  /s/ F. Keith Ball_____

                  UNITED STATES MAGISTRATE JUDGE